We'll now hear counsel in David Solomon v. Amazon Company, etc. Number 20-19-48. Mr. Pattis? Is Mr. Pattis there? I forgot to hit the unmute button. I'm sorry, Judge. Norm Pattis here on behalf of Mr. Solomon. I apologize, everyone. No, no, no. That happens all the time. Right. Thank you. David Solomon has been accused and treated as a sexual predator by the defendants, and it's an accusation that he emphatically denies and wants nothing better than to confront his accusers. And in the course of the underlying litigation, he groped in a number of proceedings to try to learn who the accuser was so that he could confront her or both of them if there is more than one. He learned on November 9th that he was the recipient of a trespass notice and promptly placed the store manager on notice of his intent to litigate. He tried for some 20 days to contact a defendant, Whole Foods General Counsel, and was blown off. He went to the Texas bar for assistance. They made a recommendation. He finally heard from Texas for Whole Foods Counsel on December 1st and learned then for the first time of certain e-mails sent on October 15th and October 29th of 2017. Shortly thereafter, he made a preservation request for information. Electronic information was initially told there was none and learned on January 26, 2018, that there may have been, but it was destroyed. He filed thereafter a pro se complaint before the New York Human Rights Division. He tried to file it on August 23rd, 2018, and nothing happened for the longest period of time. So he filed then while a piece of paper had been filed and apparently mislaid a federal claim on October 30th, or in October, rather, of 2018. The New York Human Rights Division complaint surfaced sometime in late November and was directed to the regional office in Hempstead on or about, I believe, November 19th, 2018. Thereafter, that was served on the respondents on November 27th, 2018. The New York rules of practice are clear with respect to the Human Rights Division at 46.5.3, which is recited at page 15 of our brief, using mandatory language that a complaint shall be filed in any of the regional offices. So we take the position that the district court erred in dismissing under the election of remedy doctrine that, in fact, Mr. Solomon had made it into the federal courts first by operation of the commission's own rule. His intentions may well have been to have got to the Human Rights Division first, but when they lost, mislaid, or otherwise failed to communicate with him about his filing, he felt that he had no option but to turn to federal court. So he did. Our view is that he did a lot and did plenty in his efforts to ascertain the identity of Jane Doe, and the dismissal caught him by surprise. The appellees claimed that race judicata is applicable in this case, but I would ask the court to pay specific attention and particular attention to the Human Rights Division decision on this case, which is in the appendix at page 82. Realizing that one of the issues in this case is going to be the failure to disclose or otherwise interview or otherwise get a statement under oath in any form from the alleged complainants, the Human Rights Division says it's not going to take a position on the veracity of the complaints. The record makes it clear that Mr. Solomon was known to Whole Foods and that he was a male and Jewish and that he was aware of some other allegations made against him, but he'd done no more than produce a conclusory allegation. What more could he have done, we suggest, than deny that he engaged in misconduct of any kind for the Human Rights Division to be as coy as it was in this instance, saying we're going to sidestep reliance upon hearsay in this instance. It is, in our view, a concession that they acknowledge that this was a fatally flawed proceeding and that the result is there should be no race judicata at all. Mr. Solomon attempted to amend his complaint in the district court after the dismissal, and we believe the law of this circuit suggests liberality with respect to amendments and that civil rights complaints are to be construed liberally. In this instance, he sought to amend, Mr. Solomon did, by including, among other things, a Title II claim that asserted that in the wake of his mother's death, his appearance was unkempt. As a Jewish man, he neither shaved nor cut his hair at that point, and he turned to the store, and the store reacted to the man that appeared to be for them in ways that amounted to what we will refer to as disparate impact rather than intentional discrimination. It appears to be an open question of law, whether disparate impact can support a claim of religious discrimination in a Title II context. We would like the opportunity to present a fuller record on that below so that we can pursue that claim. As to the duty of care claim that we made, we recognize the impact of the New York State decision in Basel, eliminating the distinction between invitees, licensees, and trespassers. But in this instance, we believe that Whole Foods was under an affirmative obligation to assure that people walking into its store weren't the targets of, frankly, what amounted to at the time, something like mass hysteria. It's one thing to say that women have historically been the subject of sexual misconduct. It's another thing to say, me too, we're going to believe the woman, and we're going to take no steps whatsoever to assure that an accused person has an opportunity to do a fair hearing. Mr. Solomon, we think, did plenty in his efforts to learn the identity of this woman and to avoid multiplying proceedings senselessly in this court and in the New York courts. He sought first an administrative remedy through the Human Rights Division. When that division failed for reasons that are unknown to act in a timely manner on his complaint, he went to the federal court to initiate an action before the statute of limitations was blown. He had every reason to expect that in the federal action, the identity of the young woman, or if she is young, would be made known to him. If not through the Rule 26 disclosure process, at least then through the discovery. Excuse me, you have a minute left. I'm hearing music on this phone. I don't know if you all hear it. I don't know how to stop that. I'm not causing it. Is everyone still there? Hello? I'm still here. This is Judge Radji. I don't know where the music, oh, my timer went off. So I guess I don't have time left according to my timer. So we believe that Mr. Solomon did enough under Joseph B. Butte, a decision that's on page 39 of our opening brief, to claim that he sat on his remedies and didn't do enough to find out the identity of this young woman we think is wrong. So we're asking that this court reverse for further proceedings. All right. Mr. Pattis has reserved some time, but let's hear from Ms. Nicolau. Good afternoon, Your Honors. You may please clerk. I represent the defendant, Appellees. This case has morphed from a stand-alone spoliation claim against the Appellees to an attempt to allege an allegation under Title VII of the Civil Rights Act and an allegation under Title II civil rights based on gender to human rights violation back to Title II civil rights claims based on religion to attempt to amend the complaint to assert a new cause of action from sex discrimination to discrimination based on religion or a novel argument, the latest being argued on reply for the first time disparate impact. Today, this court is hearing three issues as it relates to the Appellees. The application of the election of remedies doctrine as it applies to human rights laws, whether or not plaintiff has or can properly plead a cause of action under Title II civil rights act based on religion and plaintiff's novel negligence theory. Here, the district court was correct when it dismissed plaintiff's New York State human rights claim, finding that the plaintiff elected to file a claim before the New York State Division of Human Rights chose to prosecute that claim and wait for a decision never withdrawing it to assert it in the federal case. New York Executive Law 297 cannot be clearer. It allows for a party to request that the division dismiss the complaint or null his election of remedies so that the complainant here, the plaintiff, could file a complaint in the court of appropriate jurisdiction. This was never done here. At no time did plaintiff or his counsel, whom he retained in March of 2018, withdraw the complaint before the New York State Division of Human Rights. In fact, the first federal complaint that was filed by Mr. Solomon only alleged spoliation against the Appellee. He did not allege or try to allege a human rights cause of action. Taking it a step further, while the first motion to dismiss was pending, but before opposition submitted, the New York State Division of Human Rights issued a decision relative to Mr. Solomon's case, dismissing it. Knowing that it was dismissed, in opposition, plaintiff argued that he should be allowed to allege Title VII and Title II of the Civil Rights Act, based on, again, never moves to amend to allege human rights violations. In the interim, plaintiff admits that the New York State Division of Human Rights decision was never appealed and Article 78 proceeding was never filed. That was in Appendix 157. Despite this, plaintiff takes issue with when the claim was submitted and argues no jurisdiction, ignoring that at no time did he preserve this argument. Plaintiff's argument that the complaint was filed in November 2018, not August 2018, the date of the decision, and therefore somehow this instant action takes priority, has several flaws. One, New York State Division of Human Rights in its decision states August as the filing date, not November. Two, plaintiff's first complaint failed to raise New York's human rights claim. Three, plaintiff's opposition to Whole Foods Defendant's first motion to dismiss did not raise human rights claim. In fact, plaintiff and his opposition moved to amend to allege Title VII, Title II civil rights allegations. The opposition was filed after the New York State Division of Human Rights decision. Finally, four, plaintiff failed to appeal the decision from the New York State Division of Human Rights. Simply, plaintiff elected to prosecute his claim before the New York State Division of Human Rights. He elected not to withdraw the claim. He also elected not to appeal the decision, something he had as a right. Yet today, plaintiff argues that the election remedy should not apply in an attempt to get a second bite of the apple. This court in York v. Association of the Bar dismissed the action, finding that claims were barred since the plaintiff had previously raised those claims in the state administrative proceeding. This court pointed out that the plaintiff failed to appeal and was barred from relitigating her case. Similarly, in Scliferius v. City of New York, the Second Circuit found that the plaintiff could have requested that the New York State Division of Human Rights dismiss the complaint, but did not. Plaintiff's argument that he was not afforded due process and drank hearsay was used is baseless. Indeed, the court in New York did not consider that argument. As for drank hearsay, New York State Division of Human Rights found no probable cause based on plaintiff's own admission. To quote the decision, Appendix 82, while the investigation does not resolve what happened between the complainant and the cashiers and the customers, and the division takes no position on the veracity of the complaints or the substance of those interactions, the investigation conclusively established that the complainant was a known customer, whom by his own calculation frequented respondent a thousand times, while he was male and Jewish, and that he was spoken to by the store manager and the police because others made allegations against him. There is absolutely no evidence beyond the complainant's conclusory allegations to support that the respondent issued a notice of trespass to discriminate against the complainant because of his sex and or creed. Here, the district court correctly held that the plaintiff is barred as a matter of law from pursuing human rights violations claims in federal court as he voluntarily elected to prosecute claims before the New York State Division of Human Rights and not appeal it. Turning to the civil rights claims, in his brief, plaintiff argues he was discriminated based on his religion, while similarly arguing that it was due to the Me Too movement, which would speak to his sex rather than his religion. Sex is not covered under Title II of the Civil Rights Act. The sole basis of his argument that he was discriminated against was due to his unkept appearance, which is Appendix 154, paragraph 13. It's in the complaint. This allegation follows a detailed description of his interaction with a customer and an employee of Whole Foods Market, which led to an issuance of a trespass letter. Simply, his last complaint, just like his first amended complaint, fails to sufficiently plead a cause of action for discrimination under Title II of the Civil Rights Act. While liberal construction is applied, plaintiff is still required to plead the essential element for discrimination under Title II of the Civil Rights Act. Mainly, he does not claim that he was deprived the use of an enjoyment of a place of public accommodation, nor does he plead that the discriminatory intent surrounding the circumstances that led to the trespass. Rather, all plaintiff offers is a conclusory allegation that he was discriminated against because of his religion due to his unkept appearance. However, plaintiff admits that the issuance of the trespass letter followed the complaints made by the several customers, which were not about his religion, but about inappropriate statements he made to the customers. Just like the court in Gray v. Winehouse, here plaintiff amended once, then upon motion to dismiss, moved to amend a second time. Neither time curing deficiencies in the complaint, further evidencing futility in granting such a motion. There is no basis for an allegation under Title II of the Civil Rights Act, simply because plaintiff was issued a trespass following several complaints from customers where he appeared unkept. As for the disparate impact argument, you have to allege a specific policy by the company that has an impact on minority companies. None of their complaints allege an allegation that Pelley's had specific policy that negatively impacted the customer of a Jewish race. This argument is raised for the first time in plaintiff's reply papers, and only possibility, that is, if it's allowed to proceed, maybe he could establish disparate impact. Finally, plaintiff's novel theory of negligence, a duty to investigate complaints by customers, is also without merit. And he cites no supporting case law, nor does his second amended complaint properly plead a cognizant of negligence theory. As to the relation back doctrine, we stand on the arguments within our brief. I'm happy to entertain any questions. Thank you. I would like to ask you, at the time that he sought to amend his complaint by alleging religious discrimination under Title II, what was the history of the previous amendments to the complaint? And as a result of previous amendments to the complaint, what was the standard for a district court's decision as to whether to allow another amendment to the complaint? When he moved to allege religious discrimination, it was around the second time he was moving to amend the complaint. The court had already granted him leave to amend the complaint the first time. Judge Corman had said, you can amend the complaint to secure any deficiencies that he addressed in his original decision, which granted our motion to dismiss. Those deficiencies spoke primarily to the Jane Doe allegations. And when he did that, he did raise Title II arguments, as well as religious discrimination. And then he moved to amend it again after we filed our second motion to add additional arguments to the religious discrimination. The judge, when he looked at the motions and the motion to amend, he based it on whether or not the facts alleged in the complaint would establish a cognizable cause of action under Title II. And he determined as a matter of law that there was no factual basis that would establish a cognizable cause of action under Title II, that any such cause of action would be futile. And he was correct on that issue. Because if you look at the second amended complaint, which I believe I cited to the record, it's page 154, paragraph 13. Plaintiff alleges a series of interactions with the customers and complaints and then receiving a trespass letter. And then paragraph 13 says, well, you know, at the time I was uncapped because I was warning my mother. He doesn't allege anything that would even give rise to a potential claim that some way, somehow, his religion somehow played an impact in the decision making of whether or not... His name was Solomon, which is an extremely commonly a Jewish name. So I don't find highly persuasive that there's nothing alleged in his complaint that would permit the defendant to know his religion. But I'm wondering whether in view of the previous amendments to the complaint, the court was simply saying you had your opportunity to amend the complaint, whether that is a permissible stance of the court. Judge, I also want to point out in the record a trespass letter that was issued to the plaintiff, which is part of the record, is addressed to Mr. Dave or Dave. And it's actually said, Dear Dave. It is page... I thought I wrote it down. My apologies. But it's part of the record. And essentially, it's addressed to Dave. It doesn't reference his last name. When they issued that trespass letter, they didn't know who he was other than Dave. So the fact that his name is Solomon in the complaint, that's his name. But it doesn't mean that Whole Foods was aware of his background, Judge. There's no indication in the complaint that they knew of his background, that they knew what his religion was about, you know, what kind of religion... At the time of the issuance of the original trespass letter. Of the trespass letter, yes, Judge. Yeah. Because later they would have learned his name, right, in the interactions with the manager? Correct. Once the interactions, once he reached out to the manager, then he would have learned his name, yes. So the point is, at the time of the issuance... Okay. Go ahead. Sorry. That's what you're referring to. Go ahead. Yes. Time of the issuance of the trespass letter, there was no... It was just to Dave, and there was no indication that they knew his last name. So how did they issue the trespass letter to him? He was identified by pointing him out, by the complainant pointing him out to somebody, so they made a visual identification? Judge, it's not part of the record, but he was identified because he was a regular at the store. I mean, when he reported to the New York State Division of Human Rights that he visited this particular store a thousand times, I don't think he was exaggerating. He was a very... He was a regular. People knew him as Dave in the store. There were a few incidences that gave rise to approaching Dave at the time. In fact, the plaintiff himself admits in New York State Division of Human Rights that a customer called police on him because of something he may have... That's something he communicated to the customer. So they knew him as Dave. That's all they knew him as. They did not know his last name. So when they served him with a trespass letter, he had actually entered the store, and once he... They knew who he was. Once he entered the store, they handed him the letter. I see. Thank you. Judge Rodger? No, thank you. I think Mr. Pannis has reserved three minutes. To respond first to the colloquy that just occurred, what the counsel leaves out is the unknown effect that exfoliation findings would have had on discovery in this case. While we go outside the record briefly, I mean, they acknowledged Whole Foods knowing Mr. Solomon was Jewish before the New York Human Rights Division. There has yet to be any credible explanation in this case about why it was so difficult for Mr. Solomon to get an answer, why videos that might have rebutted some of these claims were destroyed. And Mr. Solomon would seek adverse inferences based on exfoliation. So I think that there was adequate information present to the defendants, and given the impact of an adverse inference of the underlying proceedings, that's a jump ball. We think the court erred in not permitting amendments. We believe that when we sought to amend for the second time, it was to add additional facts. The court's initial ruling was to cure deficiencies such as the amount and controversy requirement. We were astounded by that decision on the court's part to narrow it because we read the law of the circuit as permissive amendments so that cases are reached on the merits. And in the unusual circumstances in which this case arose, a phantom proceeding before the New York Human Rights Division that was apparently lost, a rush to the court to get something in to stop the statute of limitations from running. While we figured out what was going on in New York, we don't think it was too much to ask for an amendment. As to the claim that somehow were barred by the New York State ruling, counsel refers to section 297 of the administrative regulations. The department was required to issue its probable cause finding or lack thereof within 180 days. They were six days late. So having failed in that task, having failed in the task of issuing a timely ruling, we think that is a factor that also cuts in our client's favor. As to the ruling of the Human Rights Division in Appendix 82, he didn't admit anything that was inculpatory. He admitted that there were issues. He admitted that he spoke to the whole group, but he told the human rights investigators that he denied any wrongdoing. How that leverages into the defendant's favor is astounding to us. Two additional and quick points. Under the New York State regulations governing the Human Rights Division, general counsel has no authority to accept a complaint. His role is statutorily defined as serving as general counsel. I think the agency was embarrassed by losing this complaint and agreed to relate the document back to that initial filing for reasons we don't know. We've never been given an account. We think that under Hogan, the Hogan decision, we pled enough, and there's enough in this complaint to give us the benefit of the relationship back doctrine. Mr. Solomon cannot be faulted for not exercising due diligence. His efforts to contact Warren, the necessity of his going to Texas Bar Counsel, his providing litigation notices, his filing something, albeit in the wrong office with the Human Rights Division, his participation in that process, his filing a federal complaint, his expectation that Rule 26 of the Federal Rules of Civil Procedure would be honored and not ignored, his filing interrogatories and discovery requests all suggest that under Hogan he'd done enough. So for all of these reasons, we do request that the case be remanded as I began. Mr. Solomon believes he's been labeled to the world as a sexual predator, and he has groped to understand why. And we don't think that it is asking this court or the district court for too much for the opportunity for him to confront his accuser. Thank you. Thank you, Mr. Pettis. Judge LaValle, any questions? Nothing more, thank you. Judge Rodgers? No, thank you. All right, we'll reserve decision. Thank you, sir. Thank you, Your Honor. And that letter is on page 110 of the impediment. Sorry about that. Thank you. Thank you.